UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LAUREN OPALINSKY and
ROBERTA OPALINSKY,

       Plaintiffs,

v.                                    Case No. 8:14-cv-2280-T-33TGW

DAVID GEE, Hillsborough County
Sheriff, in his official
capacity, KARL SCHOLL, Deputy
Sheriff, Hillsborough County,
in his individual capacity,
and SHAWN NAPOLITANO, Deputy
Sheriff, Hillsborough County,
in his individual capacity,

       Defendants.
_____/

## ORDER

    This matter comes before the Court upon consideration of
two Motions for Summary Judgment. Deputy Karl Scholl and
Sheriff David Gee seek summary judgment on the claims brought
by Lauren Opalinsky.[1] (Doc. # 25). Deputy Shawn Napolitano
and Sheriff David Gee also seek summary judgment on the claims
brought by Roberta Opalinsky. (Doc. # 26). With leave of
Court, Lauren and Roberta filed a consolidated response in
opposition. (Doc. # 31). Thereafter, Scholl and Gee, and

_____

[1] Because both Plaintiffs have the same last name, the Court
will refer to them by their first names when necessary.

Napolitano and Gee filed their respective replies. (Doc. ## 32, 33). The two Motions are now ripe for review. For the reasons that follow, the Court grants Napolitano and Gee's Motion for Summary Judgment as to Count I, grants Scholl and Gee's Motion for Summary Judgment as to Count III, and dismisses Counts II and IV without prejudice.

I.  **Background**

On September 26, 2010, the Opalinskys——Roberta (the mother), Richard (the father), and Lauren (the daughter)——along with Lauren's then-boyfriend, Shane Fabry, attended a Tampa Bay Buccaneers game at Raymond James Stadium. (Doc. ## 25-3 at 14:16-15:1; 25-10 at 8:24-9:9). Before entering the Stadium, the Opalinskys and Fabry tailgated, during which time Lauren drank two six-ounce bottles of wine (Doc. # 25-1 at 4), and Roberta drank two Corona-Lite beers (Doc. # 25-2 at 5). During the game, but before half-time, Lauren consumed less than half a glass of wine. (Doc. # 25-1 at 4).

Also during the game, there was a confrontation between the Opalinsky group and a man two rows in front of them. (Doc. ## 25-5 at 33:12-34:20; 25-8 at 24:17-29:18). It was at this point that Scholl and Napolitano showed up; Scholl and Napolitano instructed the Opalinsky group——and Lauren in particular——to "keep it down." (Doc. ## 25-5 at 36:25-37:24,

38:10-25); see also (Doc. # 25-8 at 30:15-22) (stating that
Scholl and Napolitano instructed the Opalinsky group not to
cheer anymore). Thereafter, the Opalinsky group, including
Lauren, started to cheer again by "jumping up and down,
cheering, [and] waiving [a] Terrible Towel." (Doc. # 25-8 at
32:4-10). Scholl and Napolitano returned and told Lauren she
would have to leave. (Doc. ## 25-3 at 38:3-5; 25-5 at 52:6-
17; 25-7 at 42:11-14; 25-8 at 33:18-20). However, Fabry
testified in his deposition that Scholl and Napolitano did
not say anything as they escorted Lauren from the stands.
(Doc. # 25-8 at 34:18-24).

Lauren left with Scholl and Napolitano; she was escorted
upstairs by Scholl and Napolitano (Doc. ## 25-7 at 42:14-17;
25-8 at 35:6-22), and followed by Richard, Fabry, and Roberta.
(Doc. # 25-5 at 52:17-23, 54:11-12). Scholl and Napolitano
reached the top of the stairs and headed, still escorting
Lauren, to the elevator. (Doc. # 25-8 at 36:24-37:20). At the
elevator, everyone——Scholl, Napolitano, the Opalinskys, and
Fabry——was grouped together. (Id. at 38:24-39:5). There were
also other people in front of the elevator. (Doc. # 25-7 at
49:4-5, 15-20). While in front of the elevator, and before
Roberta was arrested, Roberta asked "[w]here are you taking
my daughter[, i.e., Lauren]" (Doc. # 25-8 at 39:20-22), and

3

grabbed hold of Lauren's hand (Id. at 40:15-24; Doc. # 25-12 at 43:14, 23-25). Scholl testified during his deposition that Roberta attempted, or at least appeared to attempt, to grab Lauren. (Doc. # 25-10 at 19:10-23). Lauren does not personally remember what transpired from this point. (Doc. # 25-3 at 38:17-41:20, 42:4-9, 43:17-25, 44:4-7, 45:5-48:20).

Napolitano then arrested Roberta for "[i]nterference, obstructing and opposing an officer while involved in an investigation." (Doc. # 25-12 at 44:16-21, 45:20-46:1). According to Roberta, upon her arrest, she said, "for simply asking you a question" and Napolitano responded, "yes." (Doc. # 25-5 at 55:1-5). Napolitano and Roberta then entered the elevator. (Id. at 55:6).

While in the elevator, Roberta did not know where Scholl and Lauren were and Roberta did not see them. (Id. at 57:5-9). There is deposition testimony from Lauren, Richard, Scholl, and Napolitano that Napolitano and Roberta were on the elevator with Scholl and Lauren. (Doc. ## 25-3 at 46:7-19 (stating Roberta told Lauren what happened during the elevator ride and that Roberta knew what happened because she was there), 49:22-25; 25-7 at 51:10-19; 25-10 at 21:7-9; 25-12 at 48:17-23); see also (Doc. # 25-3 at 39:10-15) (stating that Lauren was in the elevator with "the officers"). When

4

the elevator doors opened, Roberta saw Scholl and Lauren standing in front of the elevator. (Doc. # 25-5 at 58:23-59:1). Scholl was standing to the side of Lauren, Lauren was handcuffed with her hands behind her back, and Scholl was holding her arm. (Id. at 59:2-6, 10-11, 13-14). In contrast, Scholl testified at his deposition that Lauren was not in handcuffs at this point in time. (Doc. # 25-10 at 21:25-22:1).

After exiting the elevator, the two pairs, Scholl and Lauren, and Napolitano and Roberta, started to walk down the corridor. (Doc. ## 25-5 at 61:3-5; 25-12 at 53:3-8). As the group walked down the corridor, Napolitano "pick[ed] up the pace" such that Scholl and Lauren were eight to ten paces behind Napolitano and Roberta. (Doc. ## 25-5 at 62:12-13, 24-25, 63:10-12; 25-10 at 27:5-9). Then, while facing forward, with her back towards Scholl and Lauren, Roberta heard Scholl say, "she hit me." (Doc. # 25-5 at 63:6-9, 64:4-11). In contrast, Napolitano testified that he first heard a "thud noise," he then turned around with Roberta and saw Scholl handcuffing Lauren; once Napolitano and Roberta walked over to Scholl, Scholl said, "she hit me, she punched me in the chest." (Doc. # 25-12 at 54:5-16). As such, Roberta did not

see what happened between Scholl and Lauren before the take-down. (Doc. # 25-5 at 64:25-65:9).

According to Scholl, once he and Lauren exited the elevator, Lauren started "tugging a little bit" and started to attempt to push Scholl's hands off of her. (Doc. # 25-10 at 27:17-23, 30:3-6). As the pair continued to walk, Lauren continued to attempt to push Scholl's hands off of her. (Id. at 28:4-7). Scholl instructed Lauren that she would be arrested if she touched him again. Scholl testified it was at this point Lauren "pulled back and came back with a fist and tried to pull[] away again." (Id. at 28:7-10); see also (Id. at 33:6-18) (stating Lauren "punched [Scholl's] chest, [with a] closed-hand fist" with her free hand). After being hit in the chest by Lauren, Scholl used a straight-arm bar takedown to bring Lauren to the floor. (Id. at 35:1-25). Scholl then handcuffed Lauren while she was on the ground. (Id. at 40:1-3). Lauren was arrested for battery on a law enforcement officer. (Doc. # 25-10 at 28:19-22).

When Roberta turned around, she saw Lauren laying on the ground with Scholl standing to Lauren's side. (Doc. # 25-5 at 63:7-9). Napolitano and Roberta walked over to Scholl and Lauren, whereupon Scholl and Napolitano helped Lauren off the ground. (Doc. # 25-10 at 39:1-17). "[W]hen [Lauren] was lifted

6

up, her legs were down like this and her head was slumped, and I[, i.e., Roberta,] said to Lauren, I said, did you hit this officer. And in a weak slurring of her words she said, I didn't do anything." (Doc. # 25-5 at 65:22-66:1).

The group then continued down the corridor with both Scholl and Napolitano assisting Lauren in walking. (Id. at 66:18-21; Doc. # 25-10 at 39:6-11). The group entered the Hillsborough Sheriff's command post in the Stadium, see (Doc. # 25-10 at 25:1-7) (characterizing the security office the group entered as the Sheriff's command post), after which Lauren and Roberta were placed in separate cells. (Doc. # 25-5 at 68:18-23). Lauren regains her memory of what transpired from this point. (Doc. # 25-3 at 50:15-23).

Lauren was given a bag of ice (Id. at 42:10-22), and was ultimately taken to the hospital by ambulance (Id. at 50:12-14, 54:7-9). Lauren was at the hospital for approximately four hours and, once released, transported to jail. (Id. at 69:12-24). Lauren went through the booking process and was screened by the jail's medical staff. (Id. at 70:21-74:12). Roberta was also taken to jail, where she was booked (Doc. # 25-5 at 72:18-19), medically screened (Id. at 75:18-24), and released around 11 (Id. at 74:19-20).

Lauren stated she suffered the following injuries: a fracture of her zygomatic arch, which did not require surgery; a fracture of her nose, which was discovered during surgery to correct a deviated septum; a small, dimple-like scar about an inch-and-a-half below the corner of her left eye that appears when she smiles; chipped teeth, the number of which Lauren does not remember and of which only one was corrected; bruising on her arms and legs; memory loss; and anxiety. (Doc. # 25-3 at 74:15-83:20). Lauren and Roberta filed their Complaint on September 12, 2014. (Doc. # 1). The Complaint brings four counts: namely, false arrest under 42 U.S.C. § 1983 by Roberta against Napolitano (Count I), false arrest under Florida law by Roberta against Gee (Count II), excessive force under 42 U.S.C. § 1983 by Lauren against Scholl (Count III), and battery under Florida law by Lauren against Gee (Count IV).

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude

a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to

be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. Analysis

"A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity." Crosby v. Monroe Cty., 394 F.3d 1328, 1332 (11th Cir. 2004). Napolitano and Scholl seek qualified immunity in this case. "Qualified immunity affords complete protection to government officials sued individually," Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012), except in cases where "the law preexisting the defendant official's

supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). Qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).

"[T]he official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." Crosby, 394 F.3d at 1332. "To determine whether an official was engaged in a discretionary function, [a court] consider[s] whether the acts the official undertook 'are of the type that fell within the employee's job responsibilities.'" Id. (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)).

Upon review of the record, the Court determines both Scholl and Napolitano were engaged in a discretionary function because escorting a person from a premises and giving a trespass warning, as well as making an arrest, are acts of

the kind that fall within an officer's job responsibilities. See Zivojinovich v. Barner, 525 F.3d 1059, 1071 (11th Cir. 2008) (concluding deputies were executing legal duty when escorting person from hotel and giving him a trespass warning); Crosby, 394 F.3d at 1332 (stating, "making an arrest is within the official responsibilities of a sheriff's deputy"). Thus, Lauren and Roberta must establish Scholl and Napolitano are not entitled to qualified immunity. See Holloman, 370 F.3d at 1264.

This Court follows a two-part analysis in determining whether qualified immunity applies. Vinyard v. Wilson, 311 F.3d at 1340, 1346 (11th Cir. 2002). The first part asks "whether [the] plaintiff's allegations, if true, establish a constitutional violation." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 736 (2002)) (internal quotation marks omitted) (alteration in original). The second part asks "whether the right was clearly established." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted). Courts have discretion to decide the order in which to address the two parts. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Nevertheless, "[b]oth elements must be satisfied for an official to lose qualified immunity." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010).

A.   **Constitutional Violation**

Roberta "must establish qualified immunity is not appropriate because the facts when viewed in the light most favorable to [her] show that [Napolitano] violated a constitutional right." Benson v. Gordon Cty., 479 Fed. Appx. 315, 317 (11th Cir. 2012) (citing Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005)). The same holds true for Lauren vis-à-vis Scholl. "At summary judgment, [the Court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) (citing Vinyard, 311 F.3d at 1347-48 as "evaluating, at summary judgment, the allegedly excessive force under the facts as described by the plaintiff, notwithstanding the defendant-officer's different version of events").

1.   **Napolitano and Roberta**

Roberta's claim against Napolitano is one for false arrest. (Doc. # 1 at ¶¶ 30-32). A claim for false arrest may not lie in the presence of probable cause. See Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (stating probable

13

cause is "an absolute bar" to a Section 1983 claim alleging false arrest). "Probable cause exists if 'the facts and circumstances within the officer's knowledge, of which he or she has reasonable trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557-58 (11th Cir. 1993) (quoting Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir. 1990)).

In conducting the qualified immunity analysis, "the issue is not whether probable cause existed in fact, but whether the officer had 'arguable' probable cause to arrest." Id. at 1558 (citing Moore v. Gwinnett Cty., 967 F.2d 1495, 1497 (11th Cir. 1992)). In other words, qualified immunity applies if "a reasonable officer 'could have believed that probable cause existed.'" Id. (quoting Moore, 967 F.2d at 1497). "Arguable probable cause does not require an arresting officer to prove every element of a crime . . ., [because to require so] would negate the concept of probable cause and transform arresting officers into prosecutors." Lee, 284 F.3d at 1195 (quoting Scarbrough v. Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001)). Furthermore, "[w]hen an officer makes an arrest, which is properly supported by probable cause to

14

arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exits nor his verbal announcement of the wrong offense vitiates the arrest." <u>Lee</u>, 284 F.3d at 1196 (quoting <u>United States v. Saunders</u>, 476 F.2d 5, 7 (5th Cir. 1973)).

Roberta bears "the burden of demonstrating the absence of probable cause in order to succeed in [her] § 1983 claim." <u>Rankin</u>, 133 F.3d at 1436 (citing <u>Evans v. Hightower</u>, 117 F.3d 1318, 1320 (11th Cir. 1997)).

It is a misdemeanor of the first degree to "resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer . . . ." Fla. Stat. § 843.02. "The statute requires that: '(1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty.'" <u>Petithomme v. Cty. of Miami-Dade</u>, 511 Fed. Appx. 966, 971 (11th Cir. 2013) (quoting <u>C.E.L. v. State</u>, 24 So. 3d 1181, 1185-86 (Fla. 2009)); <u>see also</u> <u>Storck v. City of Coral Springs</u>, 354 F.3d 1307, 1315 (11th Cir. 2003) (same). "This includes any attempt to oppose or to obstruct the officer." <u>Daker v. Steube</u>, 514 Fed. Appx. 885, 888 (11th Cir. 2013)

(quoting <u>Post</u>, 7 F.3d at 1558-59 (applying Section 843.02)) (internal quotation marks omitted).

Roberta does not challenge that Napolitano was engaged in the lawful execution of a legal duty. <u>See</u> (Doc. # 31 at 29-33) (challenging only whether probable cause existed). Therefore, the Court addresses only the second element.

Under the second element, subject to exceptions not relevant here, probable cause cannot exist on mere words. <u>Davis v. Williams</u>, 451 F.3d 759, 765 (11th Cir. 2006) (stating, "Florida courts have generally held, with very limited exceptions, that physical conduct must accompany offensive words to support a conviction under § 843.02" (citing <u>Francis v. State</u>, 736 So. 2d 97, 99 (Fla. 4th DCA 1999))); <u>see also</u> <u>D.G. v. State</u>, 661 So. 2d 75, 76 (Fla. 2d DCA 1995) (stating, "[i]f a police officer is not engaged in executing process on a person, is not legally detaining that person, or has not asked the person for assistance with an ongoing emergency . . .[,] the person's words alone can rarely, if ever, rise to the level of obstruction"). "The test under section 843.02 is not whether [an officer] ultimately was able to carry out the execution of his legal duties, but rather, whether [the plaintiff] resisted his efforts in doing so." <u>Francis</u>, 736 So. 2d at 99.

The Court determines Napolitano had arguable probable cause to arrest Roberta. The record shows that Roberta grabbed, or attempted to grab, Lauren's hand while in front of the elevator. (Doc. ## 25-8 at 40:15-24; 25-10 at 19:10-23; 25-12 at 43:14). Nothing in the record directly contradicts that Roberta did so.

Richard and Lauren have no memory of Roberta's actions at the elevator. (Doc. ## 25-7 at 65:1-5; 25-3 at 44:4-7, 46:4-25, 47:12-23). Furthermore, Roberta's deposition testimony does not directly contradict Fabry's, Scholl's, and Napolitano's deposition testimony. Compare (Doc. # 25-5 at 54:17-55:6), with (Doc. ## 25-8 at 40:15-24; 25-10 at 19:10-23; 25-12 at 43:14).

Other courts have found that merely blocking an officer's pathway constituted an offense, or at least probable cause for an offense, under Section 843.02. Daker, 514 Fed. Appx. at 889 (concluding officer had probable cause under Section 843.02 where a 1983 plaintiff had blocked the officer's path); Francis, 736 So. 2d at 99 (affirming conviction under Section 843.02 where defendant physically blocked path of officer during the latter's investigation). Here, Roberta's action of grabbing, or attempting to grab, Lauren while she was being escorted out of the Stadium by

17

Scholl and Napolitano is arguably at least as obstructive as blocking an officer's pathway. Thus, a reasonable officer could believe that Roberta's action of grabbing, or attempting to grab, Lauren while she was being escorted out of the Stadium for trespassing constituted probable cause to arrest Roberta for violating Section 843.02. Therefore, the Court finds Napolitano is entitled to qualified immunity.

### 2.   Scholl and Lauren

Although "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . .," it remains that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197; see also Tolan v. Cotton, 134 S.Ct. 1861, 1865 (2015) (stating that the Fourth Amendment right against unreasonable searches is the right at play when excessive force is alleged during an investigation). "The inquiry into whether this right was violated requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Tolan, 134 S.Ct. at 1865-66 (internal citation and quotation marks omitted). "The

'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1248 (11th Cir. 2004).

In determining reasonableness, a court "look[s] at the fact pattern," <u>McCullough v. Antolini</u>, 559 F.3d 1201, 1206 (11th Cir. 2009), as described by plaintiff, <u>Fils</u>, 647 F.3d at 1288, "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." <u>McCullough</u>, 559 F.3d at 1206 (citation omitted). The reasonableness of the force used must not be judged "with the 20/20 vision of hindsight." <u>Id.</u> (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). A Court's "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments——in circumstances that are tense, uncertain, and rapidly evolving——about the amount of force that is necessary in a particular situation." <u>Id.</u> (quoting <u>Graham</u>, 490 U.S. at 396-97) (internal quotation marks omitted). Because "[t]he

constitutional test for excessive force is necessarily fact specific," Terrell, 668 F.3d at 1251 (quoting McCullough, 559 F.3d at 1206) (alteration in original), this Court "must still slosh [its] way through the factbound morass of 'reasonableness,'" Id. (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)).

In conducting this inquiry, the Court evaluates "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Vinyard, 311 F.3d at 1347 (quoting Lee, 284 F.3d at 1197-98). The need-for-force criterion "is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198. "[T]he force used by a police officer . . . must be reasonably proportionate to the need for that force." Id.

Here, Lauren argues:

[o]f critical importance is the fact that Dep. Scholl is 6'0" and 200 pounds, while Lauren Opalinsky is 5'1" and 95 pounds. Before inflicting a violent takedown that severely injured Lauren, Dep. Scholl had full control of Lauren's left arm in an arm-lock. At absolute worse, a young girl who was one-half the deputy's weight, and a full foot shorter, was **able to touch him in the chest once with her free right arm.** To conclude that a full-blown, violent, face-first takedown on concrete was even conceivably necessary under these circumstances defies belief. **Although battery on an officer can be a severe crime in many**

20

> **circumstances, no reasonable person could conclude that this was one of them; the touch by Lauren upon Dep. Scholl could scarcely qualify as a battery.** In any event, the other two Graham factors, danger to the officer and risk of flight, were totally nonexistent. Accordingly, it is clearly established under the circumstances that no reasonable officer could conclude that Dep. Scholl's level of force was proportionate under the Graham factors.

(Doc. # 31 at 37) (emphasis added).

Although Lauren challenges the degree of her battery on Scholl, her argument does not challenge that she touched Scholl in the chest; in fact, her argument concedes the point. Scholl's deposition testimony comports with Lauren's concession and evinces that Lauren was resisting by pulling away from Scholl, attempting to push his hands off of her, and, ultimately, that she hit Scholl in the chest. (Doc. # 25-10 at 27:17-35:12).

Applying these facts to the Vinyard, 311 F.3d at 1347, and Lee, 284 F.3d at 1198, factors, the Court determines no constitutional violation occurred. As Lauren was being escorted from the Stadium for trespass, she was arrested for battery on a law enforcement officer. (Doc. # 25-10 at 27:22, 28:19-22). Nothing in the record contradicts Scholl's deposition testimony that Lauren resisted by pulling away. Furthermore, although Roberta recalls seeing Lauren at some point before the take-down in handcuffs, Roberta did not

actually witness the take-down, or the moments immediately preceding it. (Doc. # 25-5 at 59:2-9, 64:25-65:9).

Notably, however, in response to Scholl and Gee's Motion for Summary Judgment, Lauren does not argue she was handcuffed. Rather, Lauren's argument concedes that she struck Scholl with her free hand. (Doc. # 31 at 37) (stating, Lauren was "able to touch him in the chest once with her free right arm. . . . [T]he touch by Lauren upon Dep. Scholl could scarcely qualify as a battery."). And, Scholl──the only witness with any memory of the actual take-down and the moments preceding it──testified that Lauren battered him by attempting to push his hands off of her and striking him in the chest. (Id. at 27:17-35:12). Again, in response to Scholl and Gee's Motion for Summary Judgment, Lauren does not challenge Scholl's testimony. See (Doc. # 31 at 9-13, 33-37).

In addition, the amount of force used by Scholl was minor. See Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003) (concluding that forcing a suspect down to the ground is de minimis force). Furthermore, although Lauren was injured (Doc. # 74:15-83:20), the third Vinyard factor only slightly weighs in her favor. See Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1356 (11th Cir. 2015) (noting that application of force "while the suspect has not given up

. . . is not necessarily excessive" (citing <u>Zivojinovich</u>, 525 F.3d at 1073 (concluding use of Taser on handcuffed suspect not excessive under the circumstances))).   The force used by Scholl was reasonably proportionate to the need for that force.  And, even assuming for the sake of argument that a constitutional violation did occur, Scholl would still be entitled to qualified immunity because, as discussed more fully below, Lauren failed to carry her burden under the clearly-established prong.

### B.   <u>Clearly-Established</u>

Under this prong, Lauren "must also show that the right involved was clearly established at the time of the putative misconduct." <u>Benson</u>, 479 Fed. Appx. at 317  (quoting <u>Terrell</u>, 668 F.3d at 1250) (internal quotation marks omitted).  "The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right." <u>Bussey-Morice v. Gomez</u>, 587 Fed. Appx. 621, 627 (11th Cir. 2014) (citing <u>Coffin v. Brandau</u>, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)).  "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" <u>Tolan</u>, 134 S.Ct. at 1866 (quoting <u>Hope</u>, 536 U.S. at 741) (alterations in

original). "[T]he touchstone of qualified immunity is notice." Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003).

The Eleventh Circuit has established two methods for determining whether the right in question was clearly established at the time of the alleged misconduct. Fils, 647 F.3d at 1291. Under the first, "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing Marsh v. Butler Cty., Ala., 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc)).

Under the first method, the Court looks at the relevant case law at the time of the violation; the right in question is "clearly established if 'a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'" Fils, 647 F.3d at 1291 (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1333 (11th Cir. 2008)) (alteration in original). The cases need not be "materially similar" to the officer's conduct. Id. "But, where the law is stated in broad propositions, 'a very

24

high degree of prior factual particularity may be necessary.'" Id. (quoting Hope, 536 U.S. at 740-41).

The second method, termed the obvious-clarity method, "involves evaluating the officer's conduct and deciding whether the officer's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law on point." Bussey-Morice, 587 Fed. Appx. at 627 (quoting Fils, 647 F.3d at 1291) (alteration in original) (citation and internal quotation marks omitted). This method "recognizes that although concrete facts are typically necessary to provide an officer with notice of 'the hazy border between excessive and acceptable force,' when an officer's conduct is 'so outrageous that it clearly goes "so far beyond" these borders, qualified immunity will not protect him . . . .'" Id. (quoting Fils, 647 F.3d at 1291-92).

The obvious-clarity method "offers a narrow exception to the general rule that only case law and specific factual scenarios can clearly establish a constitutional violation," however, it "is a difficult one to meet." Id. at 627-28. Nevertheless, "qualified immunity will be denied if the preexisting law '[made] it obvious that the defendant's acts

25

violated the plaintiff's rights in the specific set of circumstances at issue.'" Montero v. Nanlal, 597 Fed. Appx. 1021, 1026 (11th Cir. 2014) (quoting Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010)).

In her response, Lauren attempts to carry her burden by citing several cases (Doc. # 31 at 33-36); however, each one is readily distinguishable, and so they did not provide the requisite notice to Scholl. In each case the plaintiff was a non-resisting, compliant suspect. Reese v. Herbet, 527 F.3d 1253, 1273 (11th Cir. 2008) (stating, "[a]t no point was Reese fighting back or attempting to escape . . .."); Walker v. City of Rivera Beach, 212 Fed. Appx. 835, 839 (11th Cir. 2006) (stating, "Walker . . . did not resist or attempt to flee again"); Davis, 451 F.3d at 767 (noting force was applied "while Davis was following [the officer's] order"); Lee, 284 F.3d at 1191 (stating, "Lee did not resist [the officer] at any time during this incident"); Sheth v. Webster, 145 F.3d 1231, 1234-35 (11th Cir. 1998) (showing officer shoved, kneed, and twisted the arm of plaintiff because plaintiff stated she knew her rights during a conversation with the officer, and noting officer "lacked even the arguable probable cause necessary to succeed on a qualified immunity defense"); Thornton v. City of Macon, 132 F.3d 1395, 1400

  
(11th Cir. 1998) (stating, "neither [suspect] actively resisted arrest").

In contrast, the record demonstrates that Lauren resisted Scholl. (Doc. # 25-10 at 27:17-35:12). Lauren does not cite any cases from the Supreme Court, Eleventh Circuit, or the Supreme Court of Florida holding that an officer may not apply force to a suspect who is resisting. Nor has Lauren carried her burden under the narrow exception of the obvious-clarity method. Thus, even if a constitutional violation occurred, Scholl would nevertheless be entitled to qualified immunity.

### C.   State-Law Claims

Having found that Napolitano and Scholl are entitled to qualified immunity on Counts I and III, respectively, the Court exercises its discretion and declines to exercise supplemental jurisdiction over the remaining state-law claims, Counts II and IV, against Gee. See 28 U.S.C. § 1367(c)(3). Accordingly, Counts II and IV are dismissed without prejudice. See Hicks v. Moore, 422 F.3d 1246, 1255 n.8 (11th Cir. 2005) (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (stating, "[c]ertainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well")); Raney v. Allstate Ins.

27

<u>Co.</u>, 370 F.3d 1086, 1088-89 (11th Cir. 2004) (stating, "[t]he decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Napolitano and Gee's Motion for Summary Judgment (Doc. # 26) is **GRANTED** as to Count I of the Complaint.

(2) Scholl and Gee's Motion for Summary Judgment (Doc. # 25) is **GRANTED** as to Count III of the Complaint.

(3) Because the Court exercises its discretion and declines to exercise supplemental jurisdiction over Roberta's and Lauren's respective state-law claims, Counts II and IV are **DISMISSED WITHOUT PREJUDICE.**

(4) Roberta and Lauren's Motion in Limine (Doc. # 21) is **DENIED AS MOOT.**

(5) The Clerk is directed to enter judgment in favor of Napolitano as to Count I and in favor of Scholl as to Count III.

(6) The Clerk is further directed to terminate all pending deadlines and, thereafter, **CLOSE THIS CASE.**

28

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 21st day of January, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE